Good afternoon everyone. We're ready to hear our argument in our first case, Clendening v. United States. Mr. Baker, we'll hear from you first. Thank you, your honor. May it please the court. Your honors, my name is Nick Baker on behalf of Carol Clendening. Judge Britt erred in applying the discretionary function exception to Carol Clendening's wrongful death claims of her husband when there was no discovery or evidentiary hearing and on its face. Your honors, we're here on a 12 v. 1 motion to dismiss in which Mrs. Clendening has put forth a sufficient nexus that her husband's wrongful death was caused by the tortious conduct of the United States at Camp Lejeune, North Carolina, and also that he was injured by its failure to warn him, to test him, to notify him of all of the poisons, toxins, and radiological material that he was exposed to. Your honors, 12 v. 1 asks this court to review whether the district court has subject matter jurisdiction. The matter cannot be waived. It will live for the life of this complaint and for the life of the action. Your honors are permitted to entertain documents and evidence outside the record without converting it to a rule 56 motion. While your honors, the question is not whether Captain Clendening could be exposed. Even though it was not expected of his service, we respectfully disagree that his exposure was incident to service. That is not what I wish to absorb your honors discussion. The question before the court is whether the government was required to do something about the fact that it knew Clendening was exposed to radioactive and chemical toxins. Your honors, there are several rules that the government must follow. They are not guidelines, they are mandatory. Requirements of this government. Those are included in not only that 6240.3 water quality BUM standard, B-U-M-E-D standard, that state substances which may have a deleterious psychological effect or which psychological effects are unknown should not be introduced into the water. There also is... So Mr. Baker, just to be clear in terms of your position, you spoke to the incident of service in terms of when he was initially exposed, but you can focus your argument perhaps a good direction given the state of the case law on the failure to warn. And are you talking about the failure to warn after he had left the service or while he was still on active duty? No, your honor. While he was out of service, after active duty. In fact, when the government in 1980... And what would trigger a different type of duty to warn than that which the government had while he was on active duty? What triggered a different type? My apologies, your honor. Their own regulations, your honor, particularly NAVMED B-U-M-E-D 5055 radiation control and NAVMED 5095 poison control. We'd also submit to your honors that there's been no discovery period. So were those regulations in effect while he was on active duty? No, those regulations came out after his active duty service. And that is what the case... So you're saying that military acquired a duty that did not exist while he was on active duty? Your honor, that is exactly what the case law states, that if the government were to know about the exposures and the risks associated with contamination, for instance, or ingestion that would have psychological problems like in Stanley versus CIA, if all that knowledge was known while on active duty, it doesn't give rise to the exposure. It only applies, the failure to warn applies when the government learns of the inherent dangers after the service and the service did not at all relate to the exposure. Captain Clendening was on Camp Lejeune for 19 months to train to be a JAG officer with the United States Marine Corps. Nothing about his service was related to toxic exposures and also these... Well, do you contend that that language goes to parsing out what his military specialty was while he was on active duty or simply the fact that he was on active duty? I'm not familiar with any cases in this area that delve into the actual duties of military personnel. They do not distinguish those, your honor. That really is for the argument of incident to service, and again, not what I wish to absorb your time. The regulations, the requirements, particularly of radiation control where the government is required to test and treat personnel, they don't distinguish between active duty and non-active duty. Individuals they learn have been poisoned or exposed, they are to treat those individuals. There's a whole subsection for individuals. It doesn't matter what they're involved in, and then there's a subsection of those individuals they know were involved in atomic testing at Bikini Atoll or maybe were involved in the Manhattan Project. When you have occupational use exposure, you have a whole separate guideline on how those Once you tell us one more time exactly what statute or regulation you say gives the government a mandatory duty to have contacted Mr. Klendening. The ones I listed just now, your honor, were NAVMED 5055, and there's been three iterations of that in 1987, 2011, 2018. There's also NAVMED 5095 poison control. This is not the limit of the regulations the government must follow. In fact, in many of the cases before this circuit, a discovery period has been granted. For instance, in Seaside Farms, three years of discovery permitted. 25,000 pages of the documents were permitted to be exchanged to explore whether or actually is any other mandates within the government to decide and determine whether the government was with discretion not to. Well, if this NAVMED 5055 creates a mandatory duty, what purpose would discovery serve at this stage? Seems like either for there to be liability that has to be playing on the face of the statute or the regulation that there is a non-dischargeable mandatory duty to warn. Am I right or wrong there? Yes, but that is not the only regulation. There's the Nuclear Regulatory Commission that has its own guidelines. What we have in the allegations of the complaint, your honor, is fraudulent concealment. The government continues to deny the reality of what happened at Camp Lejeune and the tens of thousands of service members, civilians, and individuals who've been contaminated and are prematurely dying. I want to explore Judge Agee's question a little bit in terms of a NAVMED reg that you bring up here. That's a Navy regulation promulgated by the Secretary of Navy, I take it, or entity of that sort. So you're telling me this duty exists for the Navy but not for the Army. Is that correct? I haven't researched the Army regulation, your honor. That's not an Army regulation, that's a Navy regulation. So it's not for the Air Force, not Army. You're saying it's unique to the Navy and the Marine Corps because it's a NAVMED regulation and that has created a duty on the part of the United States government that did not exist before the Navy. Secretary of Navy creates it without any input from DOD or from DOD. It's a NAVMED regulation that applies to all Navy and Marine personnel, your honor. I understand. So you're saying that individual services can create a duty which otherwise ferries would bar? Not ferries, your honor, the discretionary function exception. We believe the case law, your honor, states that ferries does not apply to a failure to warn after service. Ferris is only an activity... I was assuming that it does apply, but okay. Well, then you're saying that in that instance, the discretionary function would be abrogated by this regulation that the Navy chooses to do for the regulation of its own personnel as opposed to other services. Is that where we're going with this? Yes, your honor. Just the same as the BUMED standards for drinking water cited in Washington versus Department of Navy at the same court by Chief Judge Boyle. That is the companion case to this case. We also believe, your honor, there are regulations outside the Department of Navy that control the disposal of nuclear material. We cited even the 1954 atomic energy... Do those regulations create a duty as you say this Navy regulation does, this Navy NAVMED regulation does? Does it create a duty? Yes, your honor. We do believe so. After this much time, the policy considerations that this court would normally give to a discretionary exception examination have expired. 40 years the government has known of the toxins and chemicals they have poisoned their own service members and for no military purpose whatsoever. At this point, your honor, it is time that we investigate the full extent of this contamination and all regulations governing what needs to be done by this military to work... I don't think any of us agree there's something wrong here. We are bound by the case law. Do you know of any case that's gone in a direction that you are saying we should go that a individual service regulation creates a duty to warrant after an individual is off of active duty, during which time he would not been able to recover because he was on active duty, but once he's off, there's an independent duty because they enacted it after he got off. In any case like that, I mean, you spoke of the nuclear cases where you would dispose, there got to be some cases out there because there are a number of incidents in which individuals are exposed to things. I mean, the agent arm situation creates a different situation because it was a settlement, but there are instances which service members are exposed to hazardous or toxic substances and then they get off of duty and then the dangers are discovered. So what cases are there to say that meets the discretionary function exception? Your honor, outside of the military context, I would cite... Keep us in the military context because we like to talk about the case we have at hand. Well, I just wanted to speak to the Bureau of Prisons in Rich v. U.S., which would be a limitation or an examination, but we've also believed that in Cole v. U.S., the companion case that's at the district court and is not binding on this court, I realize, speaks to how... Give me one that is binding on us or one that is at least persuasive. That's not even persuasive at this point. Give us something. Your honors, we would ask that if you consider these claims in the context of, for instance, Saunders v. United States, Wood v. U.S., NRAKBR burn pit litigation, that case is actually... Let me ask you to pause, Mr. Baker. I don't think simply citing the cases without explanation is responsive to my colleague's question. So if you could please give us a sound bite as to each at a minimum that we would appreciate. NRAKBR burn pit litigation, your honors, is an instance where they're examining and have tribal issues of fact after even a discovery period to determine whether or not the control of the water, even during a time of war, which is a separate exception under the Federal Tort Claims Act, is an issue that creates a mandatory regulation in which the government must follow to not expose their service members. That is from this court in just, I believe, six years ago, your honors. Well, whatever regulations are involved in that case, do you say that the same regulations apply here? Because it's going to be the language of the regulations or a statute that would set forth some sort of non-dischargeable mandatory duty. So we'd have to be sure we were doing the proverbial apples to apples comparison for it to be precedential. Well, your honor, without the full discovery and investigation period that was provided in that matter, we believe, yes, that these same standards likely will apply once they've gone back through the district. Well, the point is whether the regulations that would be applicable to Mr. Clendenin and his estate are the same ones that you say apply in these other cases. I'm asking because I don't know. I cannot speak to that at this time, your honor. It is my understanding that those two, poison control and not the radiation control, because that was not the issue of the burn pits, but the poison control would apply and the mandatory language within it would apply to regulating in that instance how they set up their burn pits in a time of war and during a combat situation that which we do not have here. Your honors, there's an issue that is intertwined with these matters. I see that my time has expired. I'd like to reserve for rebuttal, your honors. That'd be fine. Thank you very much, Mr. Baker. Mr. Tenney? Mr. Tenney, can you hear us? Yes, your honor. Thank you, your honor. All right. Thank you, Mr. Tenney for the United States. The district court dismissed the claims insofar as they were premised on exposure while on active duty at the Marine Corps base based on the Ferris doctrine and then concluded that if there was a new post-discharge failure to warrant claim that arose after active service, then that claim was barred by the discretionary function exception. So it's important to keep those things straight. I haven't heard a lot today about the Ferris component of the district court's holding. I'm happy to take any questions the court has about that, but I think that follows pretty well from this court's case law and from... No, he's pretty much squarely looking at the discretionary exception component of this and really what we really probably didn't get into, we talked about the regulation and I'm assuming he went into the regulation to say that that created a mandatory duty for them to do it, which took it outside of discretionary exceptions. Is that the way you read that? I guess that's what I understood him to be saying. He didn't quote the language of any regulation that says that there is an obligation to warn a particular category of people in particular circumstances that would apply in this case. He named some regulations, some of which I'm familiar with, others of which I'm not and don't appear to have been cited in the briefing, the ones that have been... If this NAB med regulation he cites or information that the Navy, and I'm thinking from this means an individual service can create regulations that would be mandatory. If it's mandatory, would it outside of discretionary exception? In other words, it made a duty on the part of the government that you have to warn individuals of this toxicity. I mean, there are a few components that he would need to satisfy. It's hard for me to answer the question without knowing what regulation he's talking about, which I don't think was cited in the brief. If there was a specific and mandatory... That was a general question. That wasn't to the specific regulation. That was saying if it did, if it created a... If in fact the language of it was such that we could say it created a mandatory duty on the part of the Navy to warn individuals who had been exposed to this toxic substance, would that be enough to take it outside of the discretionary exception? I think so, if I'm understanding your question correctly. If there's a specific and mandatory duty that doesn't leave any discretion and that directs a course of conduct, then that's the first step of the discretionary function analysis. Now, I... So that's his argument. That's his argument, I think, is that he's saying that Navy created these NAB med regulations. I know a little bit about Navy regulations. There's all kinds of Navy regulations out there. Navy med, one of the newer ones to me, but I understand how they promulgate it. But if it creates such a duty, and if the duty is mandatory, then it seems like it may take it out of discretionary function exception, at least for the Navy and the Marine Corps. If you hypothesize that there is a specific and mandatory regulation that doesn't leave any discretion regarding the conduct that he is arguing is negligent, then that's just reciting the first element of the test that the Supreme Court has set out for the discretionary function exception. The problem here is that... So now that we're on the same page, address the regulation he brings up. I mean, he gave it specifically to Judge Agee. It was NAB med 50555 or something of that nature. You heard what it was. Speaking of that is it discretionary or is it a matter of choice? I mean, he cited a regulation by number that I was flipping through the briefs while he was talking. I mean, I don't know what this regulation says. I'm not aware of a regulation that says that we have to warn a particular category of people. I would have expected to have heard of by now in this litigation. In his briefs, what he's relying on is regulations that were promulgated in the 70s that relate to the quality of the drinking water itself. We explained in our briefing why those regulations for a number of reasons do not give rise to the specific and mandatory obligation that he would need. He can say there's another regulation somewhere and here's a number. I can't on the fly tell you what that regulation says, but I can tell you that at no point in this litigation has there been cited a regulation that does anything of the sort that would be required by the Supreme Court's case law on this subject. So your recollection, and I don't see it in the forward of the brief and just kind of glance. I don't see this NAB med regulation cited in the brief. Mr. Baker can address that on rebuttal, but apparently your representation to us is that you haven't seen it and you're not aware of it in this case. Is that correct? Yeah, I mean, I'm not going to say that there was no point that anybody mentioned it anywhere in the district court proceedings, but it's not in the appellate briefs. It's not the ground on which he's urging that he should prevail. And he, even at the podium or the virtual podium has not quoted it and told us what it says. So I'm finding it difficult to respond on the merits to it. I would be surprised if there were a regulation that said, you know, that was sufficiently specific and mandatory to satisfy the discretionary function exception, even if there were, you know, his reliance on it would be waived for failure to raise it in the briefing. So it doesn't provide any, the possibility that there's such a regulation doesn't provide any basis to disturb the district court's judgment. The district court, like me, understood him to be relying on these other regulations, which we've addressed in our briefs, which the district court addressed in its opinion, and which do not satisfy the standard set out by the case law of this court and the Supreme Court. Do you need a regulation? Go ahead, Judge, I'm sorry. Of the regulations that are cited in the brief and the complaint, can you just talk about them a little bit further? I mean, the main regulations that he's relying on are regulations that were promulgated in 1972, and which speak to what sorts of things can be added to the drinking water. And, you know, there's some dispute in the context of whether those are sufficiently specific and mandatory when it comes to exposing people, you know, what is in the water in the first place. Those issues aren't actually presented here, because the questions regarding what was in the drinking water in the first place go to the claims for when he was on active duty, which were resolved based on the Ferris Doctrine, and he doesn't seem to be pressing that very hard. There's nothing in those, and I guess there's, I think they're block quoted, if you'll forgive me for flipping through his brief, in his brief. Or I can point you to the part of our brief where we address them. But these are really regulations about the drinking water itself. They don't say anything about warnings. And let me, if you'll pardon. So, yeah, they're discussed on page 16 of our brief. So one example is, it says drinking water shall not contain impurities in concentration, which may be hazardous to the health of the consumer. That's one example. It's quoted on page 16 of our brief, and that's one of the district court cases that he's relying on. And then our brief goes on to explain for a few reasons why that provision isn't sufficient for his purposes here. And that goes to the quality of the drinking water. That doesn't say anything about warning people. So that's one problem. That's actually sufficient. You could just sort of stop right there. The cases on which he's relying are cases that were not dismissed based on the Ferris Doctrine when the people were in active service, either because they were family members or for some other reason. There's other reasons that we don't think that applies even to that claim, which is not really live here, which we went into and which were adopted by the court in the Northern District of Georgia that has a family of cases also. But that regulation and ones like it are the ones that he's been relying on. And those regulations just don't supply a duty to warn after service. They just don't say anything about that. And if he thinks that there's another regulation that does that, it would have been incumbent upon him to raise that earlier in this litigation. Unless the court has any other questions, I'm prepared to stop there. Judge Wendt, Judge Volk, do you have any other questions of counsel? No. Not seeing any. Mr. Baker, we'll return back to you for rebuttal. Could you show us in your brief or the complaint where you have referenced these regulations that you described during the If you could turn... I apologize, Your Honor. All right. We did not specifically reference NAVMED 5055 and 5095. We did reference bomb standard 62403C and Atomic Energy Act of 1954. But that also goes to the whole issue here, Your Honors. The government in the complaint we're alleging is fraudulently concealing details about the exposure and preventing the full discovery of what all mandates have been introduced. Plus, Your Honor, just as defense can raise a subject matter jurisdiction issue at any point in this litigation, we don't see why we can't refer to our general statements in the complaint, a short and plain statement of the claim that specifically says, and in the paragraph 19 of the complaint, on page 5, on paragraph 48 of the complaint, on page 13, and paragraph 58 of the complaint. I don't have that page cite for you, Your Honors. I apologize. But those general allegations, Your Honor, invoke all... Mr. Baker, may I interrupt you? Just for the sake of argument, I took a look on my handheld, frankly, because you didn't cite it to us and allow us to study in advance. I pulled up NAVMET 5055. It is, as you would expect with a regulation, a double column, single spaced item that goes on for what appears to be dozens of pages. Could you be at least as to 5055, a little more explicit as to what you're relying upon? Yes, Your Honor. I mean, because frankly, Mr. Baker, you know, if this regulation says what you say it says, you may win. And so that's why I'm wondering why it wasn't front and center in your brief. But if you could identify it now, that would be helpful to us. Section 8, Part D, number 1, speaks very directly to these issues and that the Radiation Health Protection Program is to preserve and maintain the health of personnel while they accomplish necessary and purposeful work in the areas contaminated by radioactive material or in areas where they were exposed to ionizing radiation. The 1981 radiological report from Camp Lejeune revealed that there was ionizing radiation at levels that were even considered fallout. Fallout implies a pretty significant dose of radiation. The regulation, Your Honor, isn't just warning. It is that if you learn and know about a service member who's been exposed, then you need to test them. You need to examine them, make sure their radiation levels do not go to a point where they become at risk. Because as Mrs. Clendening has alleged in her complaint, Your Honor, her husband's treatment for his adult treatment would likely have been altered had his blood doctor known that his leukemia was likely associated with radiation. When did you become aware of this NAVMED regulation 5055? Your Honor, I'm preparing for this oral argument. So, you filed a complaint. There were motions and maybe a hearing in the district court. Appeal comes here. There are briefs filed. And this has never been raised. And was opposing counsel on notice of this prior to oral argument? But, Your Honor, there's two points that the government have claimed that are actually not true or inconsistent. Well, one of the answers to this question, was opposing counsel on notice by you of these regulations as the basis for your argument before oral argument today? We believe the satisfaction of our general complaint is satisfactory. You're not answering my question, counsel, and I'm going to keep asking it. I want to know whether you informed opposing counsel of this regulation that you're relying on before oral argument today? It seems like to me either you did or you didn't. Okay, so I needed to know. Your Honor, we would submit that the government has alleged they did not violate any regulation or a mandatory requirement. We're researching these regulations and if we could have the opportunity to conduct a little bit of discovery, there was no evidentiary hearing or hearing at the district court. And this was a facial challenge on the discretionary function exception. We never got into these details and that's what we ask that Your Honors to give us the opportunity to do. My time is up, Your Honors. I have a question I want to ask you in terms of the timing of this. At least I understand that the exposure to cleansing occurred back in May 1970 to December 1971. And you maintain at some point in time this regulation was put in force. When was it put in force? I believe, Your Honor, for 5055, the first initial regulation was established in 1987. It was modified in 2001 and then again in 2018. Obviously the last one. When did he get off of active duty? I believe, you know, that's a great question, Your Honor. I know he was not at Lejeune after December of 1971. I believe he served in Japan and Okinawa until 1973. So when did the duty to one, when did that arise? Your Honor, just as the cases hold, like in Stanley and all these cases that examine it, when the government... But I'm asking the date in this, I'm asking just the date, you don't have to be too specific on this. I'm just asking the date that you say, even generally, when the duty to one arose in this case. When they established a requirement to address... What year? What year? What year? 1984 for the poison control and chemical toxins he was exposed to, and 1987 for the radiation control. At the very... So this duty that you maintain, created here, happened in 1984. And you can wait until now to sue? Your Honor, we were given no notice. That's in the allegation of the complaint. The government... Was the regulation public? Was this a public regulation that everybody knows about? Or was it a secret one that Navy had? No, they had it, but we had no idea that Captain Clinton's leukemia was at all related to this. This is what the government continues to suppress. They're actively... Do you have any information that would indicate they knew he had been exposed to it and was covered under this regulation? Exactly what's supplied at the district court, Your Honor. Report of radiological affairs, technical assistant visit from April 9, 1981. They knew right then and there they had a radiation problem that was surrounding the very places where he was. And then when they established their NAB meds, coupled with this, they know these individuals have been exposed and they should do something about it. And not just warn, they need to test it. Well, I just want to be clear because I thought you had indicated this regulation was promulgated after he had been out of service, which I guess he was, but it seems like it was a more recent period of time. But you're telling me this regulation was in effect as much as 40 years ago. And now, as a result of that discovery decades later, a duty that the Navy had back in 1981 is something that gives rise to a cause of action. Well, Your Honor, the government... That doesn't sound right. Government didn't acknowledge radiation exposure until 2014. These have been known. These reports show that the government knew and that they had their own regulations on how to control it. That is exactly why in the Cole U.S. and in distinguishing the Stanley cases, when you learn about these things after service, Paris does not apply. And if you have a regulation, not a guideline, you have a requirement. There is no choice. Well, let me ask the last question. Last question. When do you maintain it is your client discovered of this duty to warn that existed and the failure of the government to do it? The decedent never learned of it during his life. That's alleged. When did you as a lawyer learn of it? So this is something you didn't know even after he passed? The day after his memorial service, Your Honor. What date was that? That would be November 17, 2016. And you filed this action when? The tort claim was made in October and November of 2018. Six months transpired and was filed, I believe, in August of 2019 pursuant to the Federal Tort Claims Act, Your Honor. Okay. Thank you. Thank you, Your Honors. All right. Any further questions, Judge Volk or Judge Wynn? No, Your Honor. No. All right. Thank you all. Gentlemen, thank you very much for your arguments today. And Mr. Coleman, we're ready to move on to our next case as soon as you all can put that together.
judges: G. Steven Agee, James Andrew Wynn, Frank W. Volk